**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>LIBORIO MARTINEZ-RUBIO,<br>Defendant. | Case No. 18-CR-4037-LTS-KEM<br>**REPORT AND RECOMMENDATION** |

---

Defendant Liborio Martinez-Rubio moves to suppress evidence found in his apartment during the execution of a search warrant, arguing that the existence of probable cause in the warrant depended on bullet hole evidence obtained during a warrantless search of the stairwell of his duplex apartment and that the warrant otherwise fails to establish probable cause. Docs. 44, 44-1. He also seeks to suppress statements he made during an interrogation, arguing that he invoked the right to silence and did not validly waive his *Miranda* rights. *Id.* The Government resists. Doc. 51. I recommend **denying** the motion to suppress with respect to the evidence seized pursuant to the warrant but **granting** suppression of Martinez-Rubio's statements.

## *I. BACKGROUND*[1]

On January 10, 2018, at around 6:00 p.m., the Sioux City, Iowa, Police Department received notification from a local hospital about a patient with a gunshot wound to the chest. The patient, Javier Cheron, had arrived in a minivan driven by

[1] Unless otherwise noted, the facts in this section are taken from the testimony at the suppression hearing.

Hannah Griffin, his girlfriend, and he had a sawed-off shotgun hanging from a lanyard on his neck. Despite treatment, Cheron died.

Detective Ryan Denney of the Sioux City Police Department arrived on the scene to interview Griffin, who was understandably hysterical. Detective Denney took Griffin to the police department for questioning. At first, Griffin said that Cheron had called her for a ride, and she had picked him up on Jones Street and driven him to the hospital. Detective Denney showed Griffin a map of Jones Street, and Griffin identified the general area where she had found Cheron. Griffin's information was sufficient for officers dispatched to that area to find a duplex apartment in the 1600 block of Jones Street that had blood stains outside. *See* Docs. 57-4 through 57-11.

Detective Denney learned that surveillance video footage from the hospital showed a third person in the minivan with Griffin and Cheron, which contradicted Griffin's earlier statement. After Detective Denney confronted Griffin with this information, she eventually admitted that she and Cheron had been driving around to different locations looking for drugs, that they invited the third person to join them, and that Cheron had told Griffin to drive to the area on Jones Street she had previously identified to Detective Denney. According to Griffin, Cheron asked Griffin to drop him off in front of a residence and then circle around to the back alley. Griffin did so. While she was waiting for Cheron in the alley, she heard a gunshot, and shortly thereafter, Cheron came running to the vehicle, mortally wounded. Griffin then drove Cheron to the hospital.

Detective Denney interviewed Griffin for hours, and he testified that throughout the interview, Griffin's story gradually changed as he confronted her with new information, or she added details that she had not previously revealed. Detective Denney testified that at the time, he believed Griffin was reluctant to talk because she did not want to implicate herself in buying drugs.

While Detective Denney interviewed Griffin, other officers investigated the scene on Jones Street. The duplex at issue (so identified based on Griffin's information and the visible blood splatters outside) had one apartment on the first floor and one apartment on the second floor. The doors to the apartments were very close together on a shared front porch: the door to the first-floor apartment faced the street, and the door to the second-floor apartment was to the right and perpendicular to the street. *See* Doc. 57-1 ("UP" with arrow pointing to second-floor door). A path led from the front porch to stairs down to the sidewalk, and there was also a path on the side of the duplex. Officers found blood splatters on the sidewalk in front of the residence and to the side of the residence—a blood trail leading from the front porch to the back alley. Officers also discovered a yellow shotgun shell on the landing leading up to the residence that matched the firearm attached to Cheron's person when he arrived at the hospital.

While officers processed the scene, Martinez-Rubio came out of the second-floor apartment to see what was going on. Sioux City Police Detective Nick Thompson asked to conduct a walk-through of Martinez-Rubio's apartment, and Martinez-Rubio consented. Detective Thompson testified that he speaks Spanish (not fluently, but enough to get by) and that Martinez-Rubio spoke broken English. During the walk-through of Martinez-Rubio's apartment, Detective Thompson did not see anything of evidentiary value. He also spoke with the tenants of the first-floor apartment and walked through their apartment but did not see anything out of the ordinary. Detective Thompson then canvassed the neighborhood looking for cameras that might have captured video relevant to the investigation.

Officers finished taking pictures of the blood splatter evidence and released the scene. Meanwhile, Detective Denney's interview with Griffin was wrapping up, and Griffin offered to drive by the Jones Street house at issue with Detective Denney and point it out to him. She identified the duplex that the officers had already singled out (no

officers remained on the scene when Griffin and Detective Denney drove by). Around this time, Griffin disclosed for the first time that Cheron had told her he was going to a house with a green porch light and that he was meeting with an older Hispanic gentleman. Griffin pointed out the green porch light to Detective Denney as they drove by, which was turned off.

Detective Denney relayed Griffin's information about the older Hispanic gentleman to Detective Thompson, who had spoken with the tenants of both apartments earlier in the evening. Martinez-Rubio matched Griffin's description.[2] Detective Thompson went back to the duplex to interview Martinez-Rubio. Martinez-Rubio agreed to go to the police station to talk, and a uniformed police officer brought him to the station.

Detective Thompson and Officer Raul Gonzalez, a native Spanish speaker, conducted the interview, which began around 11:00 p.m. At the outset, they asked whether Martinez-Rubio preferred to talk to them in English or in Spanish. He said Spanish. Detective Thompson told Martinez-Rubio in Spanish that he was going to read him his rights in English, and then Officer Gonzalez would read him his rights in Spanish. Detective Thompson gave Martinez-Rubio the *Miranda* warning in English, concluding "Do you understand, or do you want me to answer some questions?" Doc. 39-1. Officer Gonzalez then repeated the *Miranda* rights in Spanish. Martinez-Rubio was somewhat slumped forward with his head down when Officer Gonzalez started to read the *Miranda* warning in Spanish, but he straightened up during the course of the reading. *See* Def. Ex. B, 23:09. Officer Gonzalez concluded the warning by asking Martinez-Rubio in Spanish if he understood. *See id.*; Doc. 39-1. He paused, and Martinez-Rubio almost imperceptibly nodded his head yes. Def. Ex. B, 23:09:15. Officer Gonzalez then asked

---

[2] Although Detective Thompson did not explicitly testify that the residents of the first-floor apartment were not older or Hispanic, this fact can be inferred from his testimony.

in Spanish: "At this time, can you answer some questions?" Doc. 39-1. Martinez-Rubio appeared to think about it for a few seconds, raised his eyebrows briefly as if considering it, and then said (in Spanish), "Well, no," and mumbled something unintelligible and hung his head down. Doc. 39-1; Def. Ex. B. In response, Detective Thompson said in Spanish, "Listen, . . . we have to speak with you because we believe that the guy was [in your apartment], OK?"[3] *Id.* Martinez-Rubio stated that he did not know what happened and that he had gone to the store to buy something, and when he returned, his apartment door was open. *Id.* While Martinez-Rubio was talking, Officer Gonzalez passed Detective Thompson a written *Miranda* waiver form. *Id.* Detective Thompson said in Spanish (gesturing between himself and Martinez-Rubio), "OK. This is the . . . we talked, uh, everyone with . . . we talked. Do you agree that it is us?" *Id.* Officer Gonzalez added something about "your right" (likely clarifying Detective Thompson's phrasing). *Id.* Martinez-Rubio shrugged his shoulders and held out his hands, palms up, and said, "yeah." *Id.* Detective Thompson then slid the waiver form over to Martinez-Rubio, which contained the *Miranda* rights in English and in Spanish. *Id.* Officer Gonzalez said, "If you can sign there to . . ." and was cut off when Detective Thompson said, "You can . . . sign here. It only says that this paper is . . . your rights, and you want to talk to us." *Id.* Martinez-Rubio signed the waiver form immediately without reading it. *Id.* Detective Thompson then began asking Martinez-Rubio general identifying questions. Doc. 39-1. Eventually, Martinez-Rubio made incriminating statements about drugs and firearms in his apartment. *Id.*

While Detective Thompson interviewed Martinez-Rubio, Detective Denney prepared the search warrant application. Detective Denney began preparing the search warrant application after he drove by the duplex with Griffin. The narrative portion of

---

[3] The transcript of the recording notes "in your apartment" is unintelligible, but Detective Thompson testified that he watched the video and believes that is what he said.

the warrant describes Cheron's presenting to the hospital with a gunshot wound and Griffin's final story about driving Cheron to the Jones Street duplex as they looked for drugs. Doc. 44-4 at 4. It also describes the blood trail leading from the duplex's front doors to the alley. *Id.* It does not include the information from Griffin about Cheron meeting with an older Hispanic man and the upstairs apartment being rented by an older Hispanic man.

The only information in the warrant application to distinguish the upstairs apartment from the first-floor apartment is information about "a gunshot hole in the sheetrock inside the entry way to . . . [the] upstairs apartment." *Id.* To access Martinez-Rubio's apartment, there was a first-floor door on the porch that opened to a flight of stairs, and there was another door at the top of the stairs. Both the upstairs and the downstairs doors locked (and the downstairs door had a deadbolt; it is unclear whether the upstairs door did as well). Detective Thompson testified that when Martinez-Rubio first came out of his apartment during the scene processing, Detective Thompson believed the downstairs front door was already open; but he testified that when he returned to the scene to question Martinez-Rubio, Martinez-Rubio was returning to his apartment after being away and appeared to be unlocking the first-floor door to his apartment on the porch.

The bullet hole was located at the top of the stairs in the wall across from the second-floor door to Martinez-Rubio's apartment. It is unclear which officer discovered the bullet hole and when and how it was discovered. Detective Thompson testified that he did not see the bullet hole on his walk-through of Martinez-Rubio's apartment, and he did not see the bullet hole when he came to interrogate Martinez-Rubio. Detective Denney testified that the bullet hole had not been discovered at the time the scene was released (after officers had taken pictures of the blood stains outside). Detective Denney could not remember who relayed the information about the bullet hole to him, but he

knew that it must have been discovered prior to the execution of the search warrant, since information about the bullet hole was included in the search warrant application. No police reports of the incident document the discovery of the bullet hole.

A state court judge signed the search warrant, authorizing the search of the upstairs duplex apartment for evidence related to the shooting. During the execution of the search warrant, officers discovered drugs and firearms. Doc. 44-5. They obtained a second search warrant authorizing the search and seizure of items related to drug trafficking. *Id.*

A criminal complaint issued against Martinez-Rubio on April 3, 2018, charging him with drug and gun offenses, and he was arrested the next day. MJ Doc. 1.[4] The grand jury returned an indictment on April 26. Doc. 1. The pretrial-motions deadline was set for June 5, 2018. Doc. 6. On May 17, 2018, Martinez-Rubio's counsel at the time requested a continuance of trial and a thirty-day extension of the pretrial-motion deadlines, which was granted. Docs. 7, 8. That same counsel requested two additional trial continuances without specifically requesting a continuance of the pretrial-motions deadline. *See* Docs. 9-10, 12-13. On September 24, 2018, appointed counsel moved to withdraw given the complicated nature of the facts of the case, counsel's busy schedule, and difficulties establishing a good relationship with Martinez-Rubio. Doc. 14. The first attorney appointed to replace counsel immediately moved to withdraw given the complexity of the case. Doc. 17. Martinez-Rubio's current counsel was appointed on September 26, 2018 (after the pretrial-motions deadline had already expired). Doc. 19. Counsel immediately requested a continuance of the trial date, noting that additional time was needed to investigate and review discovery and that "[i]t [wa]s unknown at this time if there will be any pretrial motions filed in this case." Doc. 21. Counsel did not specifically request an extension of the pretrial-motions deadline. *Id.* The request for a

---

[4] "MJ Doc." refers to the docket in the related magistrate case, 18-MJ-104-KEM.

continuance was granted, with no objection from the Government. Doc. 22. Counsel similarly moved without Government objection for a continuance on January 31, 2019, again noting that additional time was necessary to review discovery and "determine[] whether any pretrial motions will be filed." Doc. 23. The court continued trial for sixty days as requested. Doc. 24. On April 3, 2019, counsel moved for a competency evaluation. Doc. 25. Defendant was committed to the custody of the Attorney General for a competency evaluation, and he returned to the district at the end of June 2019. *See* Docs. 29, 33. After a hearing, the court found Martinez-Rubio competent on July 11, 2019. Docs. 36, 40. The next day, the court held a status conference with counsel to discuss rescheduling the trial date, which had been continued indefinitely while Martinez-Rubio's competency was in question. Doc. 42. Counsel for defendant indicated he needed to talk to his client about filing a pretrial motion. The Government noted that the pretrial-motions deadline was long past. The court extended the deadline to file any pretrial motion to August 2, 2019, over the Government's objection based on the length of time since the deadline had previously expired. *See* Docs. 42, 43. The court found the Government would not be prejudiced and that the extension served the interests of justice, recognizing that multiple attorneys had been appointed to represent Martinez-Rubio over the course of the case and that defense counsel could not have discussed the issue with his client during the pendency of the competency proceedings.

Defense counsel filed the pending motion to suppress on August 1, 2019. Doc. 44. I held a hearing on the motion on September 11, 2019, at which Detectives Denney and Thompson testified. Doc. 56. I also admitted the following exhibits into evidence:

- **Defendant Exhibit A** – transcript of audio recording of January 2018 interrogation of Martinez-Rubio with English and Spanish translation (Doc. 39-1);
- **Defendant Exhibit B** – video recording of January 2018 interrogation of Martinez-Rubio;
- **Defendant Exhibit C** – photo of the duplex (Doc. 44-2);

8

- **Defendant Exhibit D** – photo of the duplex from Google Maps (Doc. 44-3);
- **Defendant Exhibit E** – first search warrant materials (Doc. 44-4);
- **Defendant Exhibit F** – second search warrant materials (Doc. 44-5)
- **Government Exhibit 1** – photo of house number on duplex (Doc. 57);
- **Government Exhibit 2** – photo of the duplex's front porch; the door to the first-floor apartment faces the street, and the door leading to the second-floor apartment is to the right and perpendicular to the street (Doc. 57-1);
- **Government Exhibit 3** – photo of the staircase in the duplex; the second-floor apartment door is barely visible on the left (and the bullet hole is not visible, but would be out of frame to the right) (Doc. 57-2);
- **Government Exhibit 4** – photo of the bullet hole found at the top of the stairs in the wall across from the second-floor apartment door; the photo was taken at the time of the warrant execution (Doc. 57-3);
- **Government Exhibits 5 to 12** – photos of blood stain evidence outside the duplex (Docs. 57-4 to 57-11);
- **Government Exhibit 13** – Martinez-Rubio's written *Miranda* waiver (Doc. 57-12).

In its resistance (Doc. 51) and at the hearing on the motion, the Government renewed its objection to the extension of the pretrial-motions deadline.

## II.    *EXTENSION OF DEADLINES*

Federal Rule of Criminal Procedure 12(c) provides:

> **(1) Setting the Deadline.** The court may, at the arraignment or as soon afterward as practicable, set a deadline for the parties to make pretrial motions . . . .
>
> **(2) Extending or Resetting the Deadline.** At any time before trial, the court may extend or reset the deadline for pretrial motions.
>
> **(3) Consequences of Not Making a Timely Motion Under Rule 12(b)(3).** If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely. But a court may consider the defense, objection, or request if the party shows good cause.

"Good cause" is "a flexible standard that requires consideration of all interests in the particular case." **Fed. R. Crim. P. 12(c) advisory committee note to the 2014**

**amendments**. The Eighth Circuit has recognized that "[t]he absence of prejudice or delay in the trial may be relevant." *United States v. Trobee*, 551 F.3d 835, 838 (8th Cir. 2009). The determination of the existence of good cause is a matter left to the district court's discretion. *See id.* at 837-38.

Here, I found good cause existed to grant the extension. The pretrial-motions deadline expired on July 5, 2018, prior to current counsel's appointment on September 26, 2018. I also considered the complicated nature of the case—so complicated that two prior attorneys withdrew from representing Martinez-Rubio because they did not have the time or resources to adequately represent him. Although current counsel did not specifically seek to extend the pretrial-motions deadline when he moved for continuances, in each continuance, he mentioned the need to determine whether the filing of a pretrial motion was warranted, putting the Government on notice of that possibility. The better practice would have been for counsel to specifically request an extension of the pretrial-motions deadline earlier in time and for the court to extend that deadline, but I note that the failure to do so is not uncommon in this district in cases in which I serve as the magistrate judge. *See United States v. Fife*, 18-CR-4054-LTS-KEM, Docs. 10, 17-18, 37, 39-40 (pretrial-motions deadline expired on August 28, 2018; unresisted motion to file untimely motion to suppress filed on October 17, 2018, in which counsel represented he "only recently appreciated the" suppression issue "due in part to vague and confusing information in the affidavit to the search warrant"; motion granted); *United States v. Marin*, 18-CR-4011-LTS-KEM, Docs. 12, 17-18, 21, 24-25 (unresisted motion to extend pretrial-motions deadline granted when counsel moved to extend the deadline within a week after the deadline expired and within two weeks of counsel's entry of appearance); *United States v. VanWaart*, 17-CR-4063-LTS-KEM, Docs. 10, 19, 23-25, 27, 29-30 (pretrial-motions deadline expired December 13, 2017; new counsel appointed on January 3, 2018, and moved to continue trial without requesting an extension of the pretrial-

motions deadline, which was granted; motion to extend pretrial-motions deadline filed February 9, 2018; motion granted over government objection); *United States v. Essing*, 17-CR-3047-LTS-KEM, Docs. 15, 43-51, 54-56 (pretrial-motions deadline expired on October 25, 2017; retained counsel entered appearance on February 9, 2018, and moved for a continuance without requesting an extension of the pretrial-motions deadline; unresisted motion to extend pretrial-motions deadline filed on May 21, 2018; motion granted); *United States v. Linaman*, 16-CR-4102-MWB-KEM, Docs. 14, 25-26, 30, 36-38 (pretrial-motions deadline expired on January 10, 2017; retained counsel entered appearance on January 23, 2017; unresisted motion for extension of pretrial-motions deadline filed February 24, 2017; motion granted). I also considered that Martinez-Rubio appears to be a difficult client to work with—prior counsel withdrew based in part on difficulties establishing a good working relationship with Martinez-Rubio, and current counsel believed him incompetent and moved to have him evaluated in early April 2019. Moreover, current counsel could not have filed a motion to suppress or moved to have the deadline extended while Martinez-Rubio's competency was in question (April to June 2019). I recognize that I likely could have denied the motion to extend,[5] but I do not believe that I abused my discretion in finding good cause and granting the extension, and the Government has pointed to no case indicating otherwise.

---

[5] *See United States v. Trancheff*, 633 F.3d 696, 697-98 (8th Cir. 2011) (per curiam) (no abuse of discretion in denying motion to extend pretrial-motions deadline four years after it expired when defendant absconded during that four-year period and new counsel was appointed upon his re-arrest—the court noted defendant caused the delay, and prior counsel could have filed a pretrial motion within the original deadline); *Trobee*, 551 F.3d at 837-38 (no abuse of discretion in denying motion to extend pretrial-motions deadline filed three months after deadline's expiration when only reason given was that counsel did not want to move to extend deadline during plea negotiations to retain leverage and believed plea deal would be reached); *United States v. Salgado-Campos*, 442 F.3d 684, 686 (8th Cir. 2006) (no abuse of discretion in denying motion to extend pretrial-motions deadline filed three months after deadline expired and two months after retained counsel entered appearance).

I do not find that the Government has been prejudiced by the extension. At the hearing, the Government argued that it was prejudiced because Detective Denney did not remember who had told him about the gunshot hole. The Government argued that if the suppression motion had been filed by July 2018, Detective Denney would have had a better memory of the events of January 10, 2018, since only six months would have passed since they transpired, as opposed to a year and a half. Although perhaps true, six months is still a long time, and it is just as likely that Detective Denney would not have remembered who told him about the gunshot hole. Cases and suppression motions are often brought years after the original events transpired, which is why officers create police reports close in time to the events they document. Here, the discovery of the gunshot hole could (and perhaps should) have been reflected in the police reports of the incident; it was not. I further note that the Government presented testimony from only two Sioux City Police Officers (and only one of those officers was on the scene during its initial processing), despite other officers being present on the scene and involved in the events of January 10, 2018. Counsel indicated during argument that no one recalled finding the bullet hole, but no one testified or explicitly explained that they had reached out to any other officers to see if they had any recollection of the discovery of the bullet hole—including the two officers Detective Denney named in the search warrant application as having received information from. *See* Doc. 44-4 at 5. I do not find that the extension of the pretrial-motions deadline is the cause of the murky facts regarding the discovery of the bullet hole, nor the cause of any prejudice to the Government.

Accordingly, I reject the Government's argument that good cause did not exist to extend the pretrial-motions deadline after it had expired. As I noted at the hearing, I find that the interest of justice is served by granting the extension.

### III.   MOTION TO SUPPRESS

Martinez-Rubio argues that the warrantless search of his stairwell leading to the discovery of the bullet hole violated his Fourth Amendment rights.  Doc. 44-1 at 5-7. He also argues that the warrant to search his apartment failed to establish probable cause, with or without the bullet hole evidence, and that the good-faith exception does not apply because of the warrantless search of the stairwell earlier in the day.  *Id.* at 7-10.  Finally, Martinez-Rubio argues that he invoked his right to silence, or at the very least, that he did not validly waive his *Miranda* rights during the interrogation.  *Id.* at 11-12.

#### A.   Search of the Residence

##### 1.   Warrantless Search of the Stairwell

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no warrants shall issue, but upon probable cause." **U.S. Const. amend. IV**.  The warrantless search of a person's residence is "presumptively unreasonable." ***Brigham City, Utah v. Stuart***, 547 U.S. 398, 403 (2006) (quoting ***Groh v. Ramirez***, 540 U.S. 551, 559 (2004)).  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions," including the existence of exigent circumstances—such as the need "to prevent the imminent destruction of evidence or to engage in 'hot pursuit' of a fleeing suspect," *id.* at 403 (citations omitted) (quoting ***United States v. Santana***, 427 U.S. 38, 42-43 (1976)—or "the voluntary consent of an individual possessing authority," ***Georgia v. Randolph***, 547 U.S. 103, 109 (2006).  The Government bears the burden of proving by a preponderance of the evidence an exception to the Fourth Amendment justifying a warrantless search.  *See **United States v. Williams***, 346 F.3d 796, 799 (8th Cir. 2003); ***United States v. Bruton***, 647 F.2d 818, 822 (8th Cir. 1981).  But the Defendant bears

the burden of proving that the place searched is protected by the Fourth Amendment. *See United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006).

Martinez-Rubio argues that officers violated his Fourth Amendment rights when they searched the duplex stairwell and discovered the bullet hole. The Fourth Amendment protects an individual's house and its curtilage (such as the front porch), "but not surrounding open fields." *Id.*; *see Florida v. Jardines*, 569 U.S. 1, 7 (2013).

> Curtilage is "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life," *Oliver v. United States*, 466 U.S. 170, 180 (1984) . . . . Determining whether a particular area is part of the curtilage of an individual's residence requires consideration of "factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987). Although every curtilage determination grows out of its own set of facts, four factors are particularly significant: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301.

*Boyster*, 436 F.3d at 991 (bold emphasis added) (citations omitted). Here, the bullet hole was discovered on the landing of the second-floor apartment, in a wall directly across from the second-floor door to Martinez-Rubio's apartment. "The area . . . would be used every day by [Martinez-Rubio] as [he] came and went." *United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016). In addition, the stairwell and second-floor landing could only be accessed by entering a locked door on the porch. And tenants of the first-floor apartment would have no reason to access the door leading to the stairwell, as they could not reach their apartment from that door, suggesting that it was not part of a "common area." Although Detective Thompson believed the first-floor door leading to the stairwell was already open when he first arrived on the scene, he also testified that it appeared Martinez-Rubio locked the first-floor door on the porch when he left his

<div align="center">14</div>

apartment, demonstrating that Martinez-Rubio took steps to prevent others from accessing the stairwell. Fourth Amendment protections apply to the stairwell and second-floor landing leading to Martinez-Rubio's second-floor duplex apartment. *See **Hopkins***, 824 F.3d at 731-33; *see also **United States v. Burston***, 806 F.3d 1123, 1127 n.6 (8th Cir. 2015) (favorably citing *United States v. Hopkins,* No. CR14-0120, 2015 WL 4087054, at *4 (July 6, 2015 N.D. Iowa), *aff'd*, 824 F.3d 726, as holding that "a 'cement area outside Defendant's [apartment's] front door,' which was an area shared with one other unit, was protected curtilage").

Officers discovered the bullet hole prior to obtaining the search warrant, meaning the stairwell and landing were necessarily searched at some point prior to the execution of the search warrant (it does not seem that the bullet hole could have been seen from the front porch; an officer would have had to have been inside the stairwell). But no testimony establishes when this search took place. The only person to seemingly have consent to enter the second-floor apartment prior to the execution of the search warrant, Detective Thompson, testified that he did not see the bullet hole during his consensual walk-through of Martinez-Rubio's apartment. He also testified that he did not see the bullet hole when he returned later to take Martinez-Rubio in for questioning. And Detective Denney did not think the bullet hole had been discovered at the time officers released the scene after processing the blood evidence outside of the duplex. Because the Government has failed to establish the facts surrounding the discovery of the bullet hole, it has not proved by a preponderance of the evidence whether an exception to the warrant requirement, such as consent, justified the search of the stairwell and landing. I recommend finding that the warrantless search of the stairwell was presumptively unreasonable and violated the Fourth Amendment.

### 2. Search of the Apartment Under the Search Warrant

Martinez-Rubio argues that even considering the bullet hole evidence, the warrant lacked probable cause. In accordance with "[t]he Fourth Amendment's strong preference for searches conducted pursuant to a warrant," "after-the-fact scrutiny by courts of the sufficiency of [testimony supporting a search warrant] should not take the form of *de novo* review"; "the duty of a reviewing court is simply to ensure that the [issuing judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983) (last alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *accord United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). Probable cause exists when, "under the totality of circumstances, there is a fair probability [that] evidence of a crime will be found in a particular place" or that the requested search will "lead to the discovery of evidence." *United States v. Faulkner*, 826 F.3d 1139, 1144, 1146 (8th Cir. 2016). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, [the Eighth Circuit] has also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). Probable cause requires a nexus between the items officers are searching for and the place or item to be searched. *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017). "Factors to consider in determining if a nexus exists include 'the nature of the crime and the reasonable, logical likelihood of finding useful evidence.'" *Id.* (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016)).

The search warrant application sets forth the evidence used to establish probable cause for the search warrant. Doc. 44-4 at 4, 8. It notes a gunshot victim arrived at the hospital, and it sets forth Griffin's final account of the events leading up to Cheron's

shooting—that she and Cheron made numerous stops looking for drugs, until eventually, she dropped Cheron off at the duplex and pulled around back to wait for him; she heard a gunshot; and Cheron came running around the back side of the duplex to her vehicle. Doc. 44-4 at 4. Martinez-Rubio argues that because Griffin consistently changed her story, her account was unreliable, and it should not have been relied upon in determining probable cause. An attachment in the warrant application noted that Griffin's information was reliable because she "provided some information that was corroborated." Doc. 44-4 at 6. The search warrant application establishes that officers discovered blood evidence at the residence Griffin identified as the location of the shooting and that the blood trail led from the front door of the duplex to the alley. Doc. 44-4 at 4. The search warrant application also notes that officers discovered a bullet hole in the sheetrock inside the entry way of the upstairs apartment. *Id.* The evidence discovered by the officers on the scene sufficiently corroborated Griffin's statements. Although Griffin did not see whether Cheron went into the upstairs or downstairs apartment, the bullet hole evidence connects the upstairs apartment to the shooting, providing nexus and probable cause to search Martinez-Rubio's apartment for evidence of the shooting. If the district court finds that the warrantless search leading to the discovery of the bullet hole did not violate the Fourth Amendment, then I recommend upholding the subsequent search of the apartment under the warrant.

### 3. Remedy

I have found that the bullet hole evidence contained in the warrant was obtained as the result of a warrantless search to which no exception applies. What is the remedy when a search warrant relies on evidence obtained in violation of the Fourth Amendment to establish probable cause?

17

"An illegal entry will not invalidate a subsequent search warrant where information acquired as a result of the illegal entry was not necessary to the finding of probable cause" set forth in the warrant application. *United States v. Packer*, 730 F.2d 1151, 1156 (8th Cir. 1984). The Government argues that the search warrant application establishes probable cause even if the information about the bullet hole is excised from the warrant. But as Martinez-Rubio argues,[6] the bullet hole is the only evidence outlined in the warrant distinguishing the second-floor apartment from the first-floor apartment. The blood evidence led from the porch (where the front doors to both apartments were next to each other) to the back alley, and the blood trail did not make clear whether Cheron, after being shot, had come out of the first-floor or second-floor apartment.[7] Griffin did not see which apartment in the duplex Cheron went to either. Thus, if the bullet hole evidence is excluded, the information in the warrant establishes probable cause that Cheron was shot in one of the two apartments in the duplex, but it is not clear which apartment.

"The general rule is that probable cause must exist to search each unit or separate residence of a multi-unit complex." *United States v. Butler*, 793 F.2d 951, 952 (8th Cir. 1986). "This rule does not apply, however, if the premises are occupied in common or

---

[6] The Government suggested at the hearing that Martinez-Rubio had not raised a nexus argument. Martinez-Rubio's brief argues that if the bullet hole evidence is excluded, the blood evidence and Griffin's statements do not make it "clear which house Cheron actually approached, let alone which entryway of [the duplex], or from where the gunshots occurred." Doc. 44-1 at 8. Therefore, Martinez-Rubio argues without the bullet hole evidence, "there was insufficient probable cause to believe that evidence of a crime would be located at the Defendant's residence." Doc. 44-1 at 9. The defendant clearly raised a nexus argument—indeed, the Government's brief responds to it as such. Doc. 51 at 8.

[7] It is also possible that Cheron was shot while standing on the porch (by someone from one of the doorways) and that he never entered either apartment. Based on the search warrant affidavit, it appears detectives believed the shooting occurred inside Martinez-Rubio's apartment, but the evidence does not completely exclude the possibility that it occurred when Cheron was at the exterior door.

18

if the entire premises are suspect." *Id.* Here, officers had no reason to suspect that the shooting was connected to both apartments—they just did not know which apartment the shooting occurred in. With the bullet hole evidence excluded, the information in the warrant fails to establish that the shooting occurred in Martinez-Rubio's apartment, as opposed to the first-floor apartment. *See United States v. Johnson*, 26 F.3d 669, 692 (7th Cir. 1994) (noting that when officer "only knew that illegal activity was occurring somewhere in the four-floor, four-unit building, i.e., in one of the units[,]" probable cause did not exist to search all the apartments in the fourplex "because the officer was in effect playing a 'shell game' searching for the one apartment out of four where the illegal activity was occurring" (discussing *United States v. Hinton*, 219 F.2d 324 (7th Cir. 1955))).

But the search may be upheld even if the warrant lacks probable cause to search Martinez-Rubio's apartment without the bullet hole evidence. Under the *Leon* good-faith exception, because "'the exclusionary rule is designed to deter police misconduct,'" it does not bar "the admission of evidence seized by officers who act in objectively reasonable, good faith reliance upon issued warrants." *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (quoting *United States v. Leon*, 468 U.S. 897, 916 (1984)). The Eighth Circuit has "applied *Leon* where . . . the search warrant application cites information gathered in violation of the Fourth Amendment." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013).

> For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, the detectives' prewarrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." If "the officers' prewarrant conduct is 'clearly illegal,' the good-faith exception does not apply."

*Id.* (quoting *United States v. Conner,* 127 F.3d 663, 667 (8th Cir. 1997)). "[T]he Government bears the burden of demonstrating the applicability of the *Leon* good faith

exception." *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003); *accord United States v. Koerth,* 312 F.3d 862, 868 (7th Cir. 2002).

Here, the facts surrounding the discovery of the bullet hole are unclear, so I am unable to determine whether it was found as the result of "clearly illegal" conduct. But in cases in which the Eighth Circuit has addressed the good-faith exception under analogous circumstances, there has been no additional evidence relevant to the probable cause determination that was not included in the warrant; the Eighth Circuit has addressed only whether it was reasonable for the officers to rely on the probable-cause determination in the warrant knowing how the evidence was obtained (in a manner a court ultimately found violative of the Fourth Amendment). *Cf. United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016) (holding that good-faith exception applied and upholding warrant which depended on evidence obtained as the result of an illegal search or seizure to establish probable cause because objectively reasonable officer could have believed no prior Fourth Amendment violation occurred); *Cannon*, 703 F.3d at 413-14 (same); *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996) (same); *United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (same); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) (same); *cf. also Conner*, 127 F.3d at 667 (holding that when officers illegally entered hotel room and obtained search warrant based on what they saw in plain view, good-faith exception did not apply because "[n]o officer could in good faith believe . . . that the defendants consented to the officers' visual or physical access to the motel room," and officers "lacked probable cause . . . prior to viewing the contents of the room"); *but see United States v. Zarate*, No. 18-CR-2073-CJW-MAR, 2019 WL 3459236, at *10-11 (N.D. Iowa July 31, 2019) (holding that when information regarding probable cause in the warrant depended on evidence seized in clear violation of the Fourth Amendment, exclusionary rule applied, even though information known to officers and

not included in the warrant "would have been more than sufficient to establish probable cause" if it had been included).

When determining whether an officer's reliance on a warrant was objectively reasonable, the Eighth Circuit has considered whether officers knew additional information relevant to the probable-cause determination but not included in the warrant. *See Johnson*, 848 F.3d at 879 (noting affiant also knew in search for sex abuse evidence that defendant was a registered sex offender, had previously failed to register as a sex offender, lived with the victim's mother during the time of alleged abuse, and occasionally lived at the residence searched); *United States v. Pruett*, 501 F.3d 976, 981 (8th Cir. 2007) (recounting testimony of affiant at suppression hearing regarding additional information that corroborated information from an informant contained in the affidavit), *vacated on other grounds*, 552 U.S. 1241 (2008), *reinstated in relevant part*, 523 F.3d 863 (8th Cir. 2008); *United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (discussing affiant's testimony at suppression hearing about additional surveillance at the place to be searched and that cocaine found prior to search warrant was consistent with distribution). Here, the officers knew additional information not included in the warrant connecting the shooting to Martinez-Rubio (rather than the first-floor apartment): Griffin told Detective Denney that Cheron had gone into the duplex to meet with an older Hispanic man, a description that matched Martinez-Rubio but not the occupants of the first-floor apartment. This additional information known to officers made their reliance on the warrant objectively reasonable, as probable cause existed to search Martinez-Rubio's apartment without the illegally obtained bullet hole evidence. *See Connor*, 127 F.3d at 667 ("The ultimate question under *Leon* is whether the officers 'had an objectively reasonable basis to believe they were complying with [applicable law] and the Fourth Amendment.'" (alteration in original) (quoting *United States v. Moore*, 956 F.2d 843, 848 (8th Cir. 1992))).

Accordingly, I recommend that the district court decline to suppress the evidence seized during the execution of the search warrant for Martinez-Rubio's apartment.[8]

### B. *Miranda*

Under *Miranda*, a suspect subject to custodial interrogation[9] must first be advised "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." 384 U.S. at 479. The suspect must waive these rights before the interrogation can proceed. *Id.* A valid *Miranda* waiver must be knowing, intelligent, and voluntary. ***United States v. Vinton***, 631 F.3d 476, 483 (8th Cir. 2011). For a waiver to be knowing and intelligent, "the suspect must have waived his rights 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting ***Moran v. Burbine***, 475 U.S. 412, 421 (1986)). For a *Miranda* waiver to be voluntary, it must be "the product of a free and deliberate choice[,] rather than intimidation, coercion, or deception." *Id.* (quoting ***Moran***, 475 U.S. at 421). The

---

[8] Given this recommendation, I decline to address the argument the Government raised for the first time at the hearing—that the inevitable-discovery exception to the exclusionary rule applied because Martinez-Rubio admitted to possessing drugs and firearms while being interrogated, and officers would have inevitably sought a search warrant for his apartment based on his statements. I do note, however, that the evidence of the bullet hole need not be suppressed under the inevitable-discovery doctrine (as it would have been discovered during the search warrant execution).

[9] The Government does not dispute that Martinez-Rubio was in custody and subject to interrogation.

government bears the burden of proof to show waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 167-68 (1986).

"During an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (quoting *Miranda*, 384 U.S. at 473-74). "A denial of knowledge does not constitute an assertion of the right to remain silent." *Simmons v. Bowersox*, 235 F.3d 1124, 1131 (8th Cir. 2001). "A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'" *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) (per curiam) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). "To say that a person must clearly and consistently assert his desire to remain silent does not mean that he must repeat his clearly asserted desire to remain silent in order to halt continued questioning." *Simmons*, 235 F.3d at 1132 n.3. "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*." *Ferrer-Montoya*, 483 F.3d at 569. The court "consider[s] the defendant's statements as whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent," *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995); "but "may not construe a defendant's assertion of *Miranda* rights to be ambiguous by looking only to subsequent responses to police questioning," *Simmons*, 235 F.3d at 1132 n.3 (citing *Smith v. Illinois*, 469 U.S. 91, 97-99 (1984) (per curiam)).

Martinez-Rubio argues that he invoked his right to remain silent or that he did not knowingly and intelligently waive his right to remain silent. After reading Martinez-Rubio his *Miranda* rights in Spanish, officers asked Martinez-Rubio if he understood, and he nodded his head yes. Officers next asked, "At this time, can you answer some questions?" Martinez-Rubio replied, "Well, no," and then mumbled something

unintelligible. In response, Detective Thompson said, "Listen, we have to speak with you because we believe that the guy was [in your apartment]." Martinez-Rubio started talking about the events earlier in the day (suggesting he had not been at home), and the officers slid him a written *Miranda* waiver form across the table, telling him to sign and that the paper "says . . . your rights, and you want to talk to us." Martinez-Rubio signed the form without reading it.

Detective Thompson testified that he interpreted Martinez-Rubio's responding "no" to whether he could answer questions as Martinez-Rubio saying he could not answer questions because he did not have any knowledge of the shooting. But Detective Thompson's response at the time demonstrates otherwise. Detective Thompson did not respond in a manner suggesting that he believed Martinez-Rubio was willing to talk to them but was denying any involvement in the shooting. Rather, by telling Martinez-Rubio that the police "ha[d] to speak with [him]," it appears that Detective Thompson understood Martinez-Rubio as saying he did not want to speak with the police. Although Martinez-Rubio mumbled something in addition to, "Well, no," that is unintelligible on the video recording, the manner in which Detective Thompson responded suggests that Martinez-Rubio did not say that he did not have any knowledge of the shooting.

Martinez-Rubio's response, "Well, no," when asked whether he wanted to talk to officers was not ambiguous given that it occurred immediately after officers read his *Miranda* rights, rather than in the middle of questioning (where it could more easily be interpreted as a refusal to talk about a particular subject or a denial of knowledge, rather than an invocation of his *Miranda* rights);[10] and given Martinez-Rubio's now-

---

[10] *Cf. **United States v. Adams***, No. 13-cr-291 (RHK/LIB), 2014 WL 12687830, at *7, 9-10 (D. Minn. Jan. 28, 2014) (holding that defendant did not invoke right to silence when six minutes into the interrogation, after being asked where he was during a robbery, the defendant responded, "I mean— I don't— just— I just [don't] like dealing with cops ... I was at my girlfriend, Rebecca's—naw, I mean, I don't want to talk to you. I mean . . ." and trailed off; the court

unintelligible mumbling and Detective Thompson's response suggesting he understood Martinez-Rubio to be saying he did not want to talk.[11]  And Detective Thompson called Martinez-Rubio's understanding of the *Miranda* rights that had just been read to him into question when Martinez-Rubio indicated he did not want to speak to the officers, and Detective Thompson suggested that he did not have a choice in the matter.  I do not find that Martinez-Rubio's signing the *Miranda* form demonstrates a knowing and intelligent waiver in this instance, since it is clear from the video that Martinez-Rubio did not read the form and that he signed it after being told officers had to speak with him, and they instructed him to "sign here."  Whether characterized as a failure to knowingly and intelligently waive his *Miranda* rights, *see Edwards v. Arizona*, 451 U.S. 477, 488-92 (1981) (Burger, C.J., concurring) (finding that the defendant did not validly waive his *Miranda* rights when a guard at the jail housing the defendant "told [defendant] that the detectives were there to see him, [the defendant] told the [guard] that he did not wish to speak to anyone[, and the guard] told him *that he had to*"), or as a failure to cease questioning once Martinez-Rubio invoked the right to silence, *see United States v. Horton*, No. 4:08CR3005, 2009 WL 1872612, at *4-5 (D. Neb. June 30, 2009) (adopting report and recommendation) (holding that defendant invoked the right to counsel when officer read defendant his *Miranda* rights; officer asked, "Are you willing  waive these

_____

relied in part on defendant saying he did not want to talk "in the context of Defendant's reluctance to talk about being at his girlfriend's residence"), *report and recommendation adopted*, 2014 WL 12696872 (Feb. 19, 2014), *aff'd*, 820 F.3d 317 at 323 (holding that defendant did not unequivocally invoke the right to silence because "[t]he phrase 'I mean' signaled that [defendant] intended to clarify the statement, . . . and the statement was therefore ambiguous").

[11] *Cf. Johnson*, 56 F.3d at 955 (when officers asked defendant if he wished to waive his *Miranda* rights, and the defendant responded "through use of profanity that he did not think he could help himself by talking," the court held the defendant did not unambiguously invoke the right to silence, relying in part on the officer's response to the defendant's statement—"[f]aced with mixed signals," the officer "attempted to determine if he wished to waive his rights").

rights and talk to me right now?"; and defendant responded, "No, I'm not. Not that I don't trust you. I just ..." and trailed off), I find that the officers violated Martinez-Rubio's rights under *Miranda* when he indicated he did not want to talk to officers, and the officers told him they had to talk and continued questioning.

Accordingly, I recommend that Martinez-Rubio's statements be suppressed as evidence in the Government's case-in-chief. *See **Harris v. New York***, 401 U.S. 222, 222, 226 (1971) (holding that "a statement made . . . under circumstances rendering it inadmissible to establish the prosecutor's case in chief under *Miranda*" can be used for impeachment purposes).

## IV. CONCLUSION

I respectfully recommend **granting** the motion to suppress in part and **denying** the motion to suppress in part (Doc. 44). I recommend that the district court suppress Martinez-Rubio's statements, but not the evidence seized during the execution of the search warrant.

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See **Fed. R. Crim. P. 59***. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the

findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

DATED this 17th day of October, 2019.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa