# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LIBORIO MARTINEZ-RUBIO,<br><br>Defendant. | No.  CR18-4037-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION** |

This matter is before me on a Report and Recommendation (R&R) (Doc. No. 60) in which the Honorable Kelly K.E. Mahoney, Chief United States Magistrate Judge, recommends that I grant in part and deny in part defendant's motion (Doc. No. 44) to suppress.  She recommends I deny the motion based on evidence seized pursuant to a search warrant under the *Leon*[1] good faith exception and grant the motion relating to statements made by defendant Liborio Martinez-Rubio in violation of *Miranda*.[2] Martinez-Rubio and the Government each filed timely objections to the R&R.  *See* Doc. Nos. 70, 71.  Martinez-Rubio also filed a response (Doc. No. 72) to the Government's objections.

## I.     BACKGROUND

### A.     *Procedural History*

A criminal complaint was issued against Martinez-Rubio on April 3, 2018, and he was arrested the next day.  *See* Doc. No. 1 in 18-MJ-104-KEM.  On April 26, 2018, the grand jury returned an indictment (Doc. No. 1) charging Martinez-Rubio with four

---

[1] *See United States v. Leon*, 458 U.S. 897, 920-21 (1984).

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

counts: conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 851 and 846; possession with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 851; possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A); and possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

As Judge Mahoney noted, this case has had multiple continuances and Martinez-Rubio is on his third appointed attorney after two prior attorneys moved to withdraw. *See* Doc. No. 60 at 7 (citing Doc. Nos. 14, 17 in which counsel cite complexities with the case, busy schedules, and difficulties establishing a good working relationship with defendant in support). His current counsel was appointed on September 26, 2018, after the pretrial-motions deadline had already expired. *Id.* Counsel moved for a continuance of the trial date but did not specifically request an extension of the pretrial-motions deadline. *Id.* The trial date was continued on that occasion and on a second occasion with no objection from the Government. *Id.* at 7-8. On both occasions, counsel indicated he sought a continuance because additional time was necessary to review discovery and determine whether any pretrial motions should be filed. Following a competency evaluation, the parties reconvened for a status conference to discuss rescheduling a trial date. *Id.* at 8. Judge Mahoney extended the deadline to file any pretrial motions over the Government's objection finding that the Government would not be prejudiced and that the extension served the interests of justice given that multiple attorneys had been appointed to represent Martinez-Rubio and counsel could not have discussed the issue with his client while the competency proceedings were pending. *Id.*

On August 1, 2019, Martinez-Rubio filed a motion (Doc. No. 44) to suppress evidence seized from his residence pursuant to a search warrant that he contends was based on illegally-obtained evidence and statements made in violation of *Miranda*. The Government filed a resistance (Doc. No. 51) on August 22, 2019. Judge Mahoney held a hearing on September 11, 2019. Doc. No. 56. At the hearing, the Government

presented testimony from Detectives Ryan Denney and Nicholas Thompson. *Id.* Judge Mahoney admitted Government Exhibits 1 through 13. She also admitted Defense Exhibits A through F. *Id.*

Judge Mahoney issued her R&R (Doc. No. 60) on October 17, 2019. The parties filed their objections (Doc. Nos. 70, 71) on October 31, 2019. Defendant filed a response (Doc. No. 72) to the Government's objections on November 7, 2019. Trial is scheduled to begin January 6, 2020. *See* Doc. No. 64.

## B.    *Relevant Facts*

Judge Mahoney summarized the following relevant facts in her R&R based on the exhibits and testimony presented during the suppression hearing:

> On January 10, 2018, at around 6:00 p.m., the Sioux City, Iowa, Police Department received notification from a local hospital about a patient with a gunshot wound to the chest. The patient, Javier Cheron, had arrived in a minivan driven by Hannah Griffin, his girlfriend, and he had a sawed-off shotgun hanging from a lanyard on his neck. Despite treatment, Cheron died.

> Detective Ryan Denney of the Sioux City Police Department arrived on the scene to interview Griffin, who was understandably hysterical. Detective Denney took Griffin to the police department for questioning. At first, Griffin said that Cheron had called her for a ride, and she had picked him up on Jones Street and driven him to the hospital. Detective Denney showed Griffin a map of Jones Street, and Griffin identified the general area where she had found Cheron. Griffin's information was sufficient for officers dispatched to that area to find a duplex apartment in the 1600 block of Jones Street that had blood stains outside. *See* Docs. 57-4 through 57-11.

> Detective Denney learned that surveillance video footage from the hospital showed a third person in the minivan with Griffin and Cheron, which contradicted Griffin's earlier statement. After Detective Denney confronted Griffin with this information, she eventually admitted that she and Cheron had been driving around to different locations looking for drugs, that they invited the third person to join them, and that Cheron had told Griffin to drive to the area on Jones Street she had previously identified

3

to Detective Denney. According to Griffin, Cheron asked Griffin to drop him off in front of a residence and then circle around to the back alley. Griffin did so. While she was waiting for Cheron in the alley, she heard a gunshot, and shortly thereafter, Cheron came running to the vehicle, mortally wounded. Griffin then drove Cheron to the hospital.

Detective Denney interviewed Griffin for hours, and he testified that throughout the interview, Griffin's story gradually changed as he confronted her with new information, or she added details that she had not previously revealed. Detective Denney testified that at the time, he believed Griffin was reluctant to talk because she did not want to implicate herself in buying drugs.

While Detective Denney interviewed Griffin, other officers investigated the scene on Jones Street. The duplex at issue (so identified based on Griffin's information and the visible blood splatters outside) had one apartment on the first floor and one apartment on the second floor. The doors to the apartments were very close together on a shared front porch: the door to the first-floor apartment faced the street, and the door to the second-floor apartment was to the right and perpendicular to the street. *See* Doc. 57-1 ("UP" with arrow pointing to second-floor door). A path led from the front porch to stairs down to the sidewalk, and there was also a path on the side of the duplex. Officers found blood splatters on the sidewalk, and there was also a path on the side of the duplex. Officers found blood splatters on the sidewalk in front of the residence and to the side of the residence – a blood trail leading from the front porch to the back alley. Officers also discovered a yellow shotgun shell on the landing leading up to the residence that matched the firearm attached to Cheron's person when he arrived at the hospital.

While officers processed the scene, Martinez-Rubio came out of the second-floor apartment to see what was going on. Sioux City Police Detective Nick Thompson asked to conduct a walk-through of Martinez-Rubio's apartment, and Martinez-Rubio consented. Detective Thompson testified that he speaks Spanish (not fluently, but enough to get by) and that Martinez-Rubio spoke broken English. During the walk-through of Martinez-Rubio's apartment, Detective Thompson did not see anything of evidentiary value. He also spoke with the tenants of the first-floor apartment and walked through their apartment but did not see anything out of the ordinary. Detective Thompson then canvassed the neighborhood

looking for cameras that might have captured video relevant to the investigation.

Officers finished taking pictures of the blood splatter evidence and released the scene. Meanwhile, Detective Denney's interview with Griffin was wrapping up, and Griffin offered to drive by the Jones Street house at issue with Detective Denney and point it out to him. She identified the duplex that the officers had already singled out (no officers remained on the scene when Griffin and Detective Denney drove by). Around this time, Griffin disclosed for the first time that Cheron had told her he was going to a house with a green porch light and that he was meeting with an older Hispanic gentleman. Griffin pointed out the green porch light to Detective Denney as they drove by, which was turned off.

Detective Denney relayed Griffin's information about the older Hispanic gentleman to Detective Thompson, who had spoken with the tenants of both apartments earlier in the evening. Martinez-Rubio matched Griffin's description. Detective Thompson went back to the duplex to interview Martinez-Rubio. Martinez-Rubio agreed to go to the police station to talk, and a uniformed police officer brought him to the station.

Detective Thompson and Officer Raul Gonzalez, a native Spanish speaker, conducted the interview, which began around 11:00 p.m. At the outset, they asked whether Martinez-Rubio preferred to talk to them in English or in Spanish. He said Spanish. Detective Thompson told Martinez-Rubio in Spanish that he was going to read him his rights in Spanish. Detective Thompson gave Martinez-Rubio the *Miranda* warning in English, concluding "Do you understand, or do you want me to answer some questions?" Doc. 39-1. Officer Gonzalez then repeated the *Miranda* rights in Spanish. Martinez-Rubio was somewhat slumped forward with his head down when Officer Gonzalez started to read the *Miranda* warning in Spanish, but he straightened up during the course of the reading. *See* Def. Ex. B, 23:09. Officer Gonzalez concluded the warning by asking Martinez-Rubio in Spanish if he understood. *See id.*; Doc. 39-1. He paused, and Martinez-Rubio almost imperceptibly nodded his head yes. Def. Ex. B, 23:09:15. Officer Gonzalez then asked in Spanish: "At this time, can you answer some questions?" Doc. 39-1. Martinez-Rubio appeared to think about it for a few seconds, raised his eyebrows briefly as if considering it, and then said (in Spanish), "Well, no," and mumbled something unintelligible and hung his head down. Doc. 39-1; Def. Ex. B. In response, Detective Thompson said in Spanish, "Listen, . . . we have to

speak with you because we believe that the guy was [in your apartment], OK?" *Id.* Martinez-Rubio stated that he did not know what happened and that he had gone to the store to buy something, and when he returned, his apartment door was open. *Id.* While Martinez-Rubio was talking, Officer Gonzalez passed Detective Thompson a written *Miranda* waiver form. *Id.* Detective Thompson said in Spanish (gesturing between himself and Martinez-Rubio), "OK. This is the . . . we talked, uh, everyone with . . . we talked. Do you agree that it is us?" *Id.* Officer Gonzalez added something about "your right" (likely clarifying Detective Thompson's phrasing). *Id.* Martinez-Rubio shrugged his shoulders and held out his hands, palms up, and said, "yeah." *Id.* Detective Thompson then slid the waiver form over to Martinez-Rubio, which contained the *Miranda* rights in English and in Spanish. *Id.* Officer Gonzalez said, "If you can sign there to . . ." and was cut off when Detective Thompson said, "You can . . . sign here. It only says that this paper is  . . . your rights, and you want to talk to us." *Id.* Martinez-Rubio signed the waiver form immediately without reading it. *Id.* Detective Thompson then began asking Martinez-Rubio general identifying questions. Doc. 39-1. Eventually, Martinez-Rubio made incriminating statements about drugs and firearms in his apartment. *Id.*

While Detective Thompson interviewed Martinez-Rubio, Detective Denney prepared the search warrant application. Detective Denney began preparing the search warrant application after he drove by the duplex with Griffin. The narrative portion of the warrant describes Cheron's presenting to the hospital with a gunshot wound and Griffin's final story about driving Cheron to the Jones Street duplex as they looked for drugs. Doc. 44-4 at 4. It also describes the blood trail leading from the duplex's front doors to the alley. *Id.* It does not include the information from Griffin about Cheron meeting with an older Hispanic man and the upstairs apartment being rented by an older Hispanic man.

The only information in the warrant application to distinguish the upstairs apartment from the first-floor apartment is information about "a gunshot hole in the sheetrock inside the entry way to . . . [the] upstairs apartment." *Id.* To access Martinez-Rubio's apartment, there was a first-floor door on the porch that opened to a flight of stairs, and there was another door at the top of the stairs. Both the upstairs and the downstairs doors locked (and the downstairs door had a deadbolt; it is unclear whether the upstairs door did as well). Detective Thompson testified that when Martinez-Rubio first came out of his apartment during the scene processing,

Detective Thompson believed the downstairs front door was already open; but he testified that when he returned to the scene to question Martinez-Rubio, Martinez-Rubio was returning to his apartment after being away and appeared to be unlocking the first-floor door to his apartment on the porch.

The bullet hole was located at the top of the stairs in the wall across from the second-floor door to Martinez-Rubio's apartment. It is unclear which officer discovered the bullet hole and when and how it was discovered. Detective Thompson testified that he did not see the bullet hole on his walk-through of Martinez-Rubio's apartment, and he did not see the bullet hole when he came to interrogate Martinez-Rubio. Detective Denney could not remember who relayed the information about the bullet hole to him, but he knew that it must have been discovered prior to the execution of the search warrant, since information about the bullet hole was included in the search warrant application. No police reports of the incident document the discovery of the bullet hole.

A state court judge signed the search warrant, authorizing the search of the upstairs duplex apartment for evidence related to the shooting. During the execution of the search warrant, officers discovered drugs and firearms. Doc. 44-5. They obtained a second search warrant authorizing the search and seizure of items related to drug trafficking. *Id.*

Doc. No. 60 at 1-7 (footnotes omitted).

## II.   STANDARD OF REVIEW

A district judge must review a magistrate judge's R&R under the following standards:

Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b). Thus, when a party objects to any portion of an R&R, the district judge must undertake a de novo review of that portion.

Any portions of an R&R to which no objections have been made must be reviewed under at least a "clearly erroneous" standard. *See, e.g.*, *Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting that when no objections are filed "[the district court judge] would only have to review the findings of the magistrate judge for clear error"). As the Supreme Court has explained, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, a district judge may elect to review an R&R under a more-exacting standard even if no objections are filed:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 150 (1985).

## III.   DISCUSSION

The Government argues Judge Mahoney erred in finding: (a) there was good cause for Martinez-Rubio to file his motion to suppress after the pretrial-motions deadline had expired and the Government was not prejudiced as a result; (b) that there was a "presumptively unreasonable" violation of the Fourth Amendment concerning the discovery of the bullet hole; (c) Martinez-Rubio unambiguously invoked his *Miranda* rights and (d) Martinez-Rubio did not knowingly and intelligently waive his *Miranda* rights. *See* Doc. No. 70. Martinez-Rubio objects to Judge Mahoney's finding that the *Leon* good faith exception upholds the search warrant even though it was based on illegally-obtained evidence. I will discuss the procedural issue regarding timing of the

motion to suppress, followed by the parties' objections related to the search warrant for Martinez-Rubio's residence and the statements he made to law enforcement.

## A.  *Good Cause to Allow Untimely Filing of Motion to Suppress*

The pretrial-motions deadline expired on June 5, 2018, and defendant's motion to suppress was filed on August 1, 2019.  Doc. No. 70 at 8.  The Government argues that current defense counsel had access to discovery materials for approximately six months before raising the competency issue, during which time he could have filed a pretrial motion or sought an extension of the deadline.  The Government contends it is prejudiced by the late filing because its witnesses were not able to recall certain details due to the 14-month time lapse.  *Id.* at 9.

Martinez-Rubio concedes it would have been the better practice to specifically request the reinstatement and extension of the pretrial-motions deadline in his motions to continue given that the deadline had passed prior to his appointment.  Doc. No. 72 at 1-2.  However, he notes that his motions to continue alerted the Government and the court that he was considering a pretrial motion. *See* Doc. Nos. 21, 23 (indicating counsel had "not yet determined whether any pretrial motions will be filed in this case.").  The Government did not object to any continuance requests and was aware that defense counsel was contemplating filing a pretrial motion.  Martinez-Rubio also cites the complexity of the case noting that it began as a homicide investigation that turned into a drug conspiracy case.  Given Martinez-Rubio's prior criminal history, 21 U.S.C. § 851 mandated a life sentence upon conviction prior to the enactment of the First Step Act at the end of 2018.  *Id.* at 2.  Prior counsel also cited the complexity of the case as a reason for seeking withdrawal.  *Id.*  Counsel states he spent significant time reviewing discovery and discussing it with Martinez-Rubio, during which time he developed a concern about defendant's competency.  *Id.* at 3.  He states he filed the motion to suppress shortly after Martinez-Rubio was determined competent to stand trial.  Martinez-Rubio argues the Government's purported prejudice regarding law enforcement's inability to articulate

who located the bullet hole in the stairwell or when is not due to the memory of the witnesses but the failure of the officers to document (or choosing not to document) the alleged unlawful search of defendant's stairwell.

Judge Mahoney observed that if a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely but may be considered if the party shows good cause. *See* Doc. No. 60 at 9 (citing Fed. R. Crim. P. 12(c)). She found there was good cause to grant the extension, noting that the pretrial-motions deadline expired on July 5, 2018, prior to current counsel's appointment on September 26, 2018. *Id.* at 10. She considered the complicated nature of the case, including the fact that two prior attorneys withdrew because they did not have the time or resources to provide adequate representation. *Id.* While current counsel did not specifically seek to extend the pretrial-motions deadline when he moved for continuances of trial, he did mention the need to determine whether to file a pretrial motion, putting the Government on notice of that possibility. *Id.* She stated that specifically requesting an extension of the pretrial-motions deadline would have been the better practice, but recognized it is not uncommon amongst attorneys in this district to exclude such a specific request when seeking unresisted continuances of trial following appointment after a previous attorney has withdrawn. *Id.* at 10-11 (citing cases). Judge Mahoney also considered that Martinez-Rubio appeared to be a difficult client to work with based on representations from previous counsel and that current counsel had moved for a competency evaluation in April 2019. During the competency evaluation, counsel could not have filed a motion to suppress or have the pretrial-motions deadline extended. Judge Mahoney noted that while it was certainly within the court's discretion to deny an extension, she found there was good cause to grant it. *Id.* at 11.

With regard to the prejudice issue, the Government argued Denney did not remember who told him about the bullet hole and that had the suppression motion been filed in July 2018, he would have had a better memory of the events that took place six months earlier on January 10, 2018. *Id.* at 12. Judge Mahoney noted that six months is

still a long time and it is just as likely that Denney would not have remembered who told him about the bullet hole after six months, as opposed to a year and a half. *Id.* She observed that cases and suppression motions are often brought years after the original events, emphasizing the importance of police reports. She noted that discovery of the bullet hole here could (and perhaps should) have been documented in a police report, but it was not. *Id.* She also observed that the Government presented testimony from only two Sioux City Police Officers (only one of whom was on the scene during the initial processing), despite other officers being present on the scene and involved in the investigation. Judge Mahoney acknowledged the Government stated no one recalled finding the bullet hole but noted that no one testified or explicitly explained they had reached out to other officers to see if anyone had recollection of discovery of the bullet hole, including the two officers Denney had named in the search warrant application as sources of information. *Id.* (citing Doc. No. 44-4 at 5). She concluded the extension of the pretrial-motions deadline was not the cause of the murky facts regarding the discovery of the bullet hole, nor the cause of any prejudice to the Government. She found the interest of justice was served by granting the extension.

The amount of time between the indictment in this case and defendant's motion to suppress is concerning. However, I agree with Judge Mahoney that there is good cause for allowing the motion and that the interest of justice is served by excusing the motion's untimeliness based on the circumstances. As Judge Mahoney noted, Martinez-Rubio's counsel referenced the need to further consider filing a pretrial motion in his motions seeking continuances of trial and the Government could have clarified at that time that it resisted a continuance of the pretrial-motions deadline, even though defense counsel did not explicitly request it. Also, given the issues with two previous counsel and the complexity of the case, an extension likely would have been granted had current counsel explicitly sought one. I agree with the reasons stated by Judge Mahoney that there is good cause for allowing the motion and the interest of justice is served by considering Martinez-Rubio's motion to suppress.

**B.      Search of Defendant's Residence**

**1.      Was the Search Presumptively Unreasonable?**

Judge Mahoney concluded that a warrantless search of Martinez-Rubio's private stairwell was presumptively unreasonable.  The unlawful search resulted in the discovery of a bullet hole, which was then used to obtain a search warrant to search Martinez-Rubio's residence.  Without the evidence of the bullet hole in the stairwell, Judge Mahoney concluded that "the information in the warrant fail[ed] to establish that the shooting occurred in Martinez-Rubio's apartment, as opposed to the first-floor apartment." Doc. No. 60 at 19.  While she concluded the search warrant affidavit lacked a sufficient nexus to Martinez-Rubio's apartment, she determined the *Leon* good faith exception applied because "officers knew additional information not included in the warrant connecting the shooting to Martinez-Rubio." *Id.* at 21.

The Government objects to Judge Mahoney's finding concerning the lack of a sufficient nexus between the shooting and Martinez-Rubio's apartment, arguing that Martinez-Rubio failed to make this argument in his motion to suppress.  *See* Doc. No. 70 at 10.  It contends this unfairly put the burden on the Government to prove the search warrant was based on probable cause (or there was an exception to the warrantless search) because the defendant had not first established that the warrant lacked probable cause. *Id.*  The Government concedes that Martinez-Rubio generally argued there was insufficient probable cause to issue a search warrant at his address.  *Id.* at 10-11. However, it states he did not support his "passing reference to a lack of nexus" with citation to legal authority. *Id.* at 11.  The Government contends Martinez-Rubio waived this argument, but if not, argues that it was not the Government's burden to prove that the search warrant was supported by probable cause.  *Id.* at 13.  It contends it is defendant's burden to prove that the warrant was not supported by probable cause.  The Government asks the court to find the warrant established probable cause to search Martinez-Rubio's home.

Martinez-Rubio responds that the Government is not arguing that he failed to raise the issue in his motion, but that he failed to "adequately argue" there was no sufficient nexus or to cite legal authority. Doc. No. 72 at 4. He contends he raised the issue and cited authority that the "Fourth Amendment requires a showing of probable cause before a search warrant may be issued." *Id.* (citing Doc. No. 44-1 at 7). He notes Judge Mahoney addressed this issue in the R&R, stating that Martinez-Rubio had "clearly raised a nexus argument" and that "the Government's brief responds to it as such." Doc. No. 60 at 18, n.6.

Judge Mahoney explained the Government bears the burden of proving by a preponderance of the evidence an exception to the Fourth Amendment justifying a warrantless search and that the defendant bears the burden of proving that the place searched is protected by the Fourth Amendment. *See* Doc. No. 60 at 13-14. She concluded that Fourth Amendment protections applied to the stairwell and second-floor landing (where the bullet hole was located). *Id.* at 15. She noted this area was used by defendant to come and go from his apartment, could only be accessed by entering a locked door on the porch and that other residents of the building would have no reason to access this area as it was not part of a "common area." *Id.* at 14. She also noted that Thompson testified that it appeared Martinez-Rubio locked the first-floor door on the porch when he left his apartment, demonstrating that he took steps to prevent others from accessing the stairwell to his upstairs apartment. *Id.* at 14-15.

The Government takes issue with the following statement in the R&R: "Because the Government has failed to establish the facts surrounding the discovery of the bullet hole, it has not proved by a preponderance of the evidence whether an exception to the warrant requirement . . . justified the search of the stairwell and landing." Doc. No. 70 at 13 (citing Doc. No. 60 at 15). It contends this punishes the Government for not proving something it did not have the burden to prove (that the search warrant was based on probable cause or pursuant to an exception to the warrant requirement). *Id.* at 10. It

states that it is defendant's burden to demonstrate by a preponderance of the evidence that the warrant was not supported by probable cause. *Id.* at 13.

The Government's argument is confusing. Regarding the respective burdens of proof, the defendant bears the initial burden of proving a Fourth Amendment violation. *See United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007) ("When the issue is whether challenged evidence is the fruit of a Fourth Amendment violation, the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."). When the defendant has met that burden, the burden shifts to the government to demonstrate why evidence obtained illegally should not be excluded or is otherwise untainted. *See United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (quoting *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011)) (noting that if defendant "comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government.").

The Government contends the finding that there was a warrantless search with no exception impermissibly put the burden on the Government when it is defendant's burden to first demonstrate by a preponderance of the evidence that the warrant was not supported by probable cause. Judge Mahoney implicitly found that defendant had met his initial burden of establishing that discovery of the bullet hole was made pursuant to a warrantless search by concluding the Government had not proved there was an exception. This finding is supported by the record given that Denney did not observe the bullet hole and neither did Thompson, who conducted the initial search of Martinez-Rubio's apartment with his consent. The application for the search warrant provides in relevant part: "Officers also located what appeared to be a gunshot hole in the sheetrock inside the entry way to 1609 Jones St. upstairs apartment." Doc. No. 44-4 at 4. Denney testified he could not recall who told him this information and his review of police reports after the incident has not revealed the source either. Doc. No. 61 at 30. Moreover, the evidence at the hearing suggested that the bullet hole could not have been observed from

any other vantage point except entering the stairwell. *Id.* at 43-45. There was no evidence that Martinez-Rubio consented to any other search of his residence outside of Thompson's initial search or that any other exception to the warrant requirement applied. *Id.* at 65-66. In concluding that the warrantless search of the stairwell was presumptively unreasonable, I find that Judge Mahoney did not misconstrue the respective burdens of the parties.

To the extent the Government is arguing the warrant was supported by probable cause without the tainted bullet hole information, I disagree. Judge Mahoney addressed that argument in Section III(A)(3) of the R&R. Doc. No. 60 at 18-19. She agreed with Martinez-Rubio that the bullet hole was the only evidence in the warrant distinguishing the second-floor apartment from the first-floor apartment, as neither the blood trail evidence nor Griffin's statements could identify which apartment Cheron came from. *Id.* at 18 ("Thus, if the bullet hole evidence is excluded, the information in the warrant establishes probable cause that Cheron was shot in one of the two apartments in the duplex, but it is not clear which apartment."). In other words, nothing establishes a nexus to Martinez-Rubio's apartment without the bullet hole information.[3] The Government emphasized in its resistance, *see* Doc. No. 51 at 7-8, that Griffin identified the house with the green porch light as where Cheron was headed. However, as established at the hearing, there were entrances to two different residences under that porch light, meaning this information alone does not provide the requisite nexus. *See* Doc. Nos. 44-2; 55-1; Doc. No. 61 at 44. Given that the probable cause finding hinged

_____

[3] I also find that Martinez-Rubio sufficiently raised the lack of nexus argument. *See* Doc. No. 44-1 at 8 (arguing that without the bullet hole evidence, the search warrant affidavit relies solely on statements from Griffin and the blood trail, neither of which establish probable cause to believe that evidence of a crime would be located at Martinez-Rubio's residence). Indeed, as noted by Judge Mahoney, the Government addressed this argument in its resistance. *See* Doc. No. 51 at 8 ("There was ample probable cause in this case in support of the search warrant, even without the statement about the bullet hole. Using common sense, the issuing judge reasonably found that there was a nexus between the defendant's residence and criminal activity.").

on the bullet hole evidence, Judge Mahoney went on to consider whether the good faith exception under *Leon* applied.

To the extent the Government argues that Judge Mahoney should have considered whether the warrant was supported by probable cause prior to considering whether the Government could prove an exception to the warrantless search, I do not find that considering the issues in the order Judge Mahoney did placed an impermissible burden on the Government to prove the warrant was supported by probable cause. Indeed, her analysis makes logical sense because if the bullet hole evidence was not tainted by an illegal search, there would be no issues with the search warrant. Judge Mahoney placed the correct burdens on the parties in concluding that there was no applicable exception to the warrantless search that led to the bullet hole evidence and that the warrant was not supported by probable cause without the bullet hole evidence. *See Alderman v. United States*, 394 U.S. 165, 183 (1969) ("The United States concedes that when an illegal search has come to light, it has the ultimate burden of persuasion to show that its evidence is untainted. But at the same time petitioners acknowledge that they must go forward with specific evidence demonstrating taint.").

To the extent the Government argues Judge Mahoney should have considered whether the warrant application was supported by probable cause *with* the tainted evidence, there appears to be no real dispute that the warrant was facially valid. *See* Doc. No. 61 at 99 (in which Martinez-Rubio acknowledged during oral argument that he could not really say that the warrant was so lacking in indicia of probable cause on its face). However, because Judge Mahoney determined that the warrant was based on illegally-obtained information (and I agree), the warrant and search may only be upheld only if the good faith exception applies. The Government bears the burden of proving this exception. *United States v. Robinson*, 336 F.3d 1293, 1297 (11th Cir. 2003). In any event, it was unnecessary to determine whether the search warrant lacked probable cause prior to undertaking the good faith exception analysis. *See United States v. Guzman*, 507 F.3d 681, 685 (8th Cir. 2007) ("A reviewing court can apply the *Leon*

16

good faith exception and evaluate the reasonableness of an officer's reliance on a warrant without first resolving the Fourth Amendment issue of whether the search warrant lacked probable cause."); *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) ("However, before reviewing the existence of probable cause, we may consider the applicability of the good-faith exception to the exclusionary rule, as established in *Leon*."). The Government does not object to Judge Mahoney's conclusion that the good faith exception applies. The Government's objections based on Judge Mahoney's conclusion that there was a presumptive Fourth Amendment violation related to the bullet hole evidence are overruled.

### 2.    *Does the Good Faith Exception Apply?*

Judge Mahoney concluded that despite the unlawfully-obtained evidence, the search warrant was saved by the good faith exception established in *Leon*. She concluded that because the circumstances of the bullet hole discovery were not entirely clear, she could not conclude that it was the result of "clearly illegal" conduct, barring the application of *Leon*. *See* Doc. No. 60 at 19-20 (citing *United States Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) for the proposition that if "the officers' prewarrant conduct is clearly illegal, the good faith exception does not apply."). She then considered whether additional information known to the detectives made their reliance on the warrant objectively reasonable. She concluded it did, stating:

> Here, the officers knew additional information not included in the warrant connecting the shooting to Martinez-Rubio (rather than the first-floor apartment): Griffin told Detective Denney that Cheron had gone into the duplex to meet with an older Hispanic man, a description that matched Martinez-Rubio but not the occupants of the first-floor apartment. This additional information known to officers made their reliance on the warrant objectively reasonable, as probable cause existed to search Martinez-Rubio's apartment without the illegally obtained bullet hole evidence.

Doc. No. 60 at 21.

Martinez-Rubio argues that information known by law enforcement that was not included in the search warrant affidavit should not serve to cure the Fourth Amendment violation. Doc. No. 71 at 3. He contends there is no evidence that the information provided by Griffin to Denney was ever provided to Thompson until after the search warrant was executed. *Id.* at 4-5. Martinez-Rubio notes that Thompson testified that he "eventually" learned that Cheron had been dropped off at an "older male's residence," and based on this information, went back to Martinez-Rubio's apartment to ask him to come to the police station for an interview. *Id.* Martinez-Rubio contends this second interaction between him and Thompson coincides with the effectuation of the search warrant. In other words, he argues that the information concerning the description of a Hispanic male had not been connected to Martinez-Rubio's apartment until after the search warrant was signed. He argues that because the information from Griffin came after the issuance of the search warrant, law enforcement should not be able to rely on *Leon*. He notes that if Denney knew an older Hispanic male was residing at the residence he wanted to search, he would have included such information in the search warrant application. Because the officers did not have an objectively reasonable belief to rely on the search warrant until after the search warrant was issued, he contends the *Leon* good faith analysis is flawed.

"When an otherwise valid search warrant is based upon evidence obtained in a prior warrantless search that violated the Fourth Amendment, it is the exclusionary rule that prohibits use of this derivative evidence to establish the probable cause needed to obtain a valid warrant." *United States v. Reed*, 921 F.3d 751, 755 (8th Cir. 2019) (quoting *United States v. Davis*, 760 F.3d 901, 904 (8th Cir. 2014)). When it is later determined that a search warrant was not supported by probable cause, evidence obtained via that warrant need not be excluded if officers reasonably relied in good faith on the judge's issuance of the warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (discussing the good faith exception as outlined in *Leon*, 468 U.S. at 897). To determine whether an officer's reliance on a warrant was objectively reasonable, the court

considers the totality of the circumstances, including information known to officers but not presented to the judge who issued the warrant. *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015). The good faith exception does not apply in four situations:

> (1)     when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
>
> (2)     when the issuing judge "wholly abandoned his judicial role in issuing the warrant;
>
> (3)     when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and
>
> (4)     when the affidavit is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* The issue is "whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *Id.* When a search warrant application provides information not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923, "a court should not refuse to apply the *Leon* good faith exception just because the officer fails to include in that affidavit all of the information known to him *supporting* a finding of probable cause." *United States v. Bynum*, 293 F.3d 192, 198-99 (4th Cir. 2002) (emphasis in original). *See also United States v. Marion*, 238 F.3d 965, 969 (8th Cir. 2001) (holding the court must consider the "totality of the circumstances" under *Leon* including information demonstrating probable cause known to the affiant, but not included in his affidavit).

None of the four situations identified above precluding application of the good faith exception apply here. Martinez-Rubio does not argue that Denney made any misleading statements in his affidavit or that the magistrate wholly abandoned his judicial role. Neither was the warrant application so lacking in indicia of probable cause to render

belief in its existence entirely unreasonable or so facially deficient that no police officer could reasonably presume the warrant was valid. I also agree with Judge Mahoney that the record does not establish that the prewarrant conduct was "clearly illegal," only that it is presumptively illegal.

Judge Mahoney found that the additional information known to detectives but not included in the application is what saves the search under the good faith exception. The issue raised by Martinez-Rubio is whether the additional information known to detectives but not included in the search warrant affidavit had to be known prior to the search warrant being signed by the judge or prior to the execution of the search warrant. The evidence is not clear regarding the timing of Griffin's description of an "older Hispanic male" to Denney, Denney and Thompson's communications connecting Martinez-Rubio to the upstairs apartment and the procurement of the signed search warrant.

Denney testified that someone told him about the bullet hole in the stairwell and guessed that that observation was made while he was talking to Griffin. *See* Doc. No. 61 at 29-30. He could not recall which detective relayed that information to him and was unable to determine who saw the bullet hole in discussing this case with other law enforcement officers involved in this investigation. *Id.* at 30. He was also not able to find it in any reports. In the search warrant, Denney wrote:

> Officers located a blood trail leading from the southeast corner of 1609 Jones St near the front door, to the rear of the house and up to the alley. Officers also located what appeared to be a gunshot hole in the sheetrock inside the entry way to 1609 Jones St upstairs apartment.

Doc. No. 44-4 at 4. Denney testified that when the scene was released, he had not received information regarding the bullet hole. Doc. No. 61 at 49. After the scene was released, Denney and another detective drove with Griffin to 1609 Jones Street to have Griffin identify the apartment she was talking about. *Id.* at 34-35. Near the end of Griffin's interview, she stated Cheron was going to visit an elderly or older Hispanic male. *Id.* at 36. It is not clear when this was communicated to Thompson, but Denney

testified Thompson recalled that this matched the description of someone he had just spoken with. Based on this information, Denney testified that Thompson went back to the scene after it had been released. *Id.* at 36-37. Thompson and a detective went back to Martinez-Rubio's apartment and observed him going in to the residence. *Id.* at 57. They asked him to come to the police station to answer some questions and he agreed. *Id.* At some unknown point, Denney completed the search warrant (without the information related to the description of an older Hispanic male) and presented it to the magistrate judge. *Id.* There was no evidence that Denney provided any additional information to the judge based on questions the judge had or otherwise. After the judge signed the search warrant, Denney and other officers went to Martinez-Rubio's apartment to serve the warrant. *Id.*

The issue of whether additional information known to officers must have been known to them at the time the search warrant was signed, or at the time it was executed, is not clear from the case law. *See United States v. Patrick*, 94 F. App'x 409 (8th Cir. 2004) (per curiam) ("In assessing the reasonableness of the officer's reliance, we take into account what he or she actually knew at the time that application for the warrant was made."); *United States v. Simpkins*, 914 F.2d 1054, 1057 (8th Cir. 1990) ("When assessing the objective [reasonableness] of police officers executing a warrant, we 'must look to the totality of the circumstances,' including any information known to the officers but not presented to the issuing judge."); *United States v. Rodriguez*, 484 F.3d 1006, 1012 (8th Cir. 2007) ("Given the officers' knowledge at the time the . . . search warrant was executed, the officers' reliance on the search warrant's validity was objectively reasonable."); *United States v. Farlee*, 757 F.3d 810, 820 (8th Cir. 2014) ("when assessing the officer's good faith reliance on a search warrant under the *Leon* good faith exception, we can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit."); *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) ("When assessing the objective [reasonableness] of police officers executing a warrant, we must look to the

totality of the circumstances, including any information known to the officers but not presented to the issuing judge."). Martinez-Rubio has not identified any case, and I have not located one in my own research, in which the court limited the "additional information" basis for the good faith exception to information known to officers at the time the search warrant was signed.

Given that the case law allows for both situations, I find that the additional information known to law enforcement officers had to have been known, at the latest, at the time the search warrant was executed. *See Leon*, 468 U.S. at 923, n.24 (noting it is necessary to consider the objective reasonableness of not only the officer who obtained the warrant or provided information for the warrant, but also the officers who eventually executed the warrant). While there may be situations in which officers had additional information at the time the search warrant was signed, but did not include it, it also makes sense to apply this exception to additional information that became known to officers prior to executing the signed search warrant. The purpose of the bullet hole information in the warrant was to connect the shooting to the residence. The information from Griffin describing the person whom Cheron was going to see accomplishes the same purpose via Thompson's knowledge. While officers knew this information at the time they executed the search warrant, the information did not make its way into the search warrant application. I find that the *Leon* good faith exception applies under the totality of the circumstances. The evidence from Griffin describing the person Cheron was going to see supports the probable cause determination and the officers' reasonable belief that the search warrant was supported by probable cause. Martinez-Rubio's objection is overruled.

## C.   Statements Made by Defendant

### 1.   Was Defendant's Response Ambiguous?

The Government objects to Judge Mahoney's findings that Martinez-Rubio unambiguously invoked his *Miranda* rights and that his subsequent signing of a written

*Miranda* waiver was not knowing and intelligent. The Government notes that whether a suspect has invoked his *Miranda* rights is an objective standard, meaning the suspect must invoke his rights in a manner that is "sufficiently clear" so that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Doc. No. 70 at 16 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). The Government contends Martinez-Rubio's response to Thompson's questions was ambiguous. *Id.* at 16-17 (citing *United States v. Orellana*, No. CR14-4046-DEO, 2014 WL 3767381 (N.D. Iowa July 31, 2014), *report and recommendation adopted*, No. CR14-4046-DEO, 2014 WL 4162677 (N.D. Iowa Aug. 20, 2014)). It notes that Judge Mahoney's observation of an "almost imperceptibl[e]" nod by the defendant in response to Thompson's first question was subjective and cannot be used in determining whether Martinez-Rubio unambiguously invoked his right to remain silent. It argues that Martinez-Rubio's response of "well, no," followed by something unintelligible, is ambiguous because it was in response to two preceding questions. It contends Judge Mahoney's observation that Thompson's response "suggests that Martinez-Rubio did not say that he did not have any knowledge of the shooting" should not be part of the waiver analysis and contradicts the record. *See* Doc. No. 70 at 17 (citing Doc. No. 60 at 24). The Government argues the video demonstrates that Martinez-Rubio's will was never overborne and law enforcement did not engage in coercion. It contends Thompson's follow-up was appropriate to Martinez-Rubio's ambiguous response.

Martinez-Rubio argues that the response "well, no" is objectively unambiguous. It contends this case cannot be compared to *Orellana*, in which the defendant's response to being asked if he was willing to answer some questions following the reading of his *Miranda* rights was "Well, yes. No . . . Well, I don't know, whatever I can answer." *Orellana*, 2014 WL 3767381, at *2. He argues the objectively verifiable facts in this case are that Martinez-Rubio said "well, no" when asked if he wished to speak with law enforcement. He contends this is supported by Thompson's response, which was not to

ask Martinez-Rubio to clarify what he wanted to do, but to tell him that they had to speak to him.

> Under *Miranda,* a suspect in custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona,* 384 U.S. 436, 479 (1966). A suspect may waive these rights if the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444. A suspect who wishes to invoke his *Miranda* rights must "do so unambiguously." *Berghuis v. Thompkins,* 560 U.S. 370, 381 (2010). The suspect "must articulate his desire . . . sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to [an invocation of the right.]" *Davis*, 512 U.S. at 459. "A suspect invokes his right to remain silent by making 'a clear, consistent expression of a desire to remain silent.'" *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2004) (quoting *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989)). "During an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" *United States v. Adams*, 820 F.3d 317, 322-23 (8th Cir. 2016) (quoting *Miranda*, 384 U.S. at 473-74). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*." *Id.*

Once a suspect invokes his right to remain silence, law enforcement must "scrupulously honor[]" this right. *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). "The critical safeguard" of the right to remain silent "is a person's 'right to cut off questioning.'" *Id.* at 103 (quoting *Miranda*, 384 U.S. at 474). The factors to determine whether a police officer "scrupulously honored" a suspects right to remain silent are:

> (1) whether the police immediately ceased the interrogation upon
> defendant's request; (2) whether they resumed questioning only after the
> passage of a significant period of time and provided a fresh set of *Miranda*
> warnings; and (3) whether they restricted the later interrogation to a crime
> that had not been the subject of the first interrogation.

*Hatley v. Lockhart*, 990 F.2d 1070, 1073-74 (8th Cir. 1993) (citing *Mosley*, 423 U.S. at 106).

I find that Martinez-Rubio's response to whether he wanted to waive his *Miranda* rights and speak with officers was unambiguous. While Thompson asked a two-part question to Martinez-Rubio, the last question immediately preceding his response was: "At this time, can you answer some questions?" Martinez-Rubio's response – "Well, no" – is unambiguous.[4] *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) ("Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous."). Indeed, Thompson's response indicates he considered it as such. Thompson did not seek clarification, as if he was in doubt about the response, but stated: "Listen, Liborio, and . . . and we have to speak with you because we believe that the guy was [in your apartment][5] OK?" *See* Doc. No. 39-1 at 1. Such a response does not "scrupulously honor" the defendant's right to remain silent. *See United States v. Shoulders*, CR. 17-50090-02-JLV, 2018 WL 4204452, at *3 (D.S.D. Sept. 4, 2018) (noting that agent's response of "we will make it real clear" and "you are being charged with first degree murder" was an attempt to persuade defendant to reconsider invoking his right to silence in violation of *Miranda*); *United States v. Tyler*, 164 F.3d 150, 154-55 (3d Cir. 1998) (police command to "tell the truth" after

---

[4] While the transcript indicates that Martinez-Rubio said something unintelligible after "well, no" I do not find this changes the analysis. *See United States v. Rambo*, 365 F.3d 906, 910 (10th Cir. 2004) ("Although the context and nuances of a request to end questioning can create ambiguity, they cannot overcome a clear expression of the desire to remain silent.").

[5] *See* Doc. No. 61 at 62 (Thompson testified that he believes he said "at your apartment" in the part marked "unintelligible" in the transcript).

defendant invoked his right to remain silent is the "antithesis" of scrupulously honoring his right to remain silent).  The fact that Martinez-Rubio continued talking to police does not constitute a waiver of his right to remain silent because his initial declination to answer questions was not scrupulously honored.  *See Mosley*, 423 U.S. at 104 ("We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'").  The Government's objection is overruled.

### 2.      *Was There a Knowing and Intelligent Waiver?*

The Government objects to Judge Mahoney's conclusion that Martinez-Rubio did not knowingly and intelligently waive his *Miranda* rights.  Judge Mahoney stated: "I do not find that Martinez-Rubio's signing of the *Miranda* form demonstrates a knowing and intelligent waiver in this instance, since it is clear from the video that Martinez-Rubio did not read the form and that he signed it after being told officers had to speak with him, and they instructed him to 'sign here.'"  Doc. No. 60 at 25.  The Government argues that defendant's signature on the written, bilingual *Miranda* waiver clarified the ambiguity stemming from his initial ambiguous response.  It contends that Thompson's statement of "you can . . . sign here," cannot reasonably be interpreted as a form of intimidation or coercion.  Moreover, it argues there was no need for Martinez-Rubio to read the form before signing it because detectives read Martinez-Rubio his *Miranda* rights in English and Spanish immediately before he signed the form.

"A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  A waiver of *Miranda* rights may be either express or implied. *See Berghuis*, 560 U.S. at 384 ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").  The government "need

prove waiver only by a preponderance of the evidence." *Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

Judge Mahoney explained that Thompson "called Martinez-Rubio's understanding of the *Miranda* rights that had just been read to him into question when Martinez-Rubio indicated he did not want to speak to the officers, and Detective Thompson suggested that he did not have a choice in the matter." Doc. No. 60 at 25. She stated:

> Whether characterized as a failure to knowingly and intelligently waive his *Miranda* rights . . . or as a failure to cease questioning once Martinez-Rubio invoked the right to silence . . . I find that the officers violated Martinez-Rubio's rights under *Miranda* when he indicated he did not want to talk to officers, and the officers told him they had to talk and continued questioning.

*Id.* at 25-26.

I do not find Martinez-Rubio's subsequent written waiver to be relevant given that the officers did not scrupulously honor his right to remain silent. *See United States v. Atchison*, No. 07-238 (PJS/JJG), 2007 WL 3232517, at *4 (D. Minn. Oct. 31, 2007) (concluding that officers' failure to scrupulously honor privilege to remain silent will also taint officers' subsequent efforts to obtain a waiver from the suspect). The Government's explanation that the written waiver form was used to clarify any ambiguity in Martinez-Rubio's response is unpersuasive when officers did not reiterate or explain his rights further but stated "we have to speak with you" and "you can, uh, sign here." Doc. No. 39-1 at 1. *See United States v. Astello*, 241 F.3d 965, 971 (8th Cir. 2001) ("any follow up questions should have been used only to clarify whether [suspect] was in fact invoking his Fifth Amendment right); *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989) (prosecutor's remark of "if you want to talk to us, now is the time to do it" after suspect stated he did not wish to be questioned was "not aimed at resolving any ambiguity in [suspect's] statement, but rather at changing his mind."). The Government's objection is overruled.

## IV.    CONCLUSION

For the reasons set forth herein:

1.     The Government's objections (Doc. No. 70) to the R&R (Doc. No. 60) are **overruled**;

2.     Martinez-Rubio's objections (Doc. No. 71) to the R&R (Doc. No. 60) are **overruled**;

3.     I **accept** Judge Mahoney's R&R (Doc. No. 60) without modification;

4.     Pursuant to Judge Mahoney's recommendation, Martinez-Rubio's motion (Doc. No. 44) to suppress is **granted in part** and **denied in part**.  It is **granted** as to Martinez-Rubio's statements and **denied** as to evidence seized during the execution of the search warrant.


**IT IS SO ORDERED.**

**DATED** this 27th day of November, 2019.

_____
Leonard T. Strand, Chief Judge